**Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins, P.C.**
Stanley O. King
Eric G. Kahn
231 South Broad Street
Woodbury, NJ 08096
Tel:  (856) 845-3001
Fax: (856) 845-3079
stan@kingslaw.com
EKahn@JaverbaumWurgaft.com

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONICA BLAIR-SMITH, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No.:  23-6506 |
| vs. | |
| CAESARS ENTERTAINMENT, INC.; BOARDWALK REGENCY LLC d/b/a CAESARS ATLANTIC CITY HOTEL & CASINO; HARD ROCK INTERNATIONAL INC.; SEMINOLE HARD ROCK SUPPORT SERVICES, LLC; BOARDWALK 1000, LLC d/b/a HARD ROCK HOTEL & CASINO ATLANTIC CITY; HARRAH'S ATLANTIC CITY OPERATING COMPANY, LLC d/b/a HARRAH'S RESORT ATLANTIC CITY HOTEL & CASINO; MGM RESORTS INTERNATIONAL; MARINA DISTRICT DEVELOPMENT COMPANY, LLC d/b/a BORGATA HOTEL CASINO & SPA; TROPICANA ATLANTIC CITY CORPORATION d/b/a TROPICANA CASINO AND RESORT ATLANTIC CITY; and CENDYN GROUP, LLC, | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

LOCAL CIVIL RULE 10.1 STATEMENT ...................................................................... iii

I.      NATURE OF THE ACTION ...................................................................... 1

II.     JURISDICTION AND VENUE .................................................................. 5

III.    THE PARTIES ........................................................................................... 6

    a.  Plaintiff ................................................................................................... 6

    b.  Defendants .............................................................................................. 7

IV.     GENERAL ALLEGATIONS ................................................................... 10

    A.  The Relevant Market is the Atlantic City Casino-Hotel Market. .............. 10

        i.    The Casino-Hotel Market is Dominated By the Casino-Hotel Defendants. ....... 11

        ii.   The Relevant Product Market is Casino-Hotel Rooms. .................................. 12

        iii.  The Relevant Geographic Market is Atlantic City. ............................................ 13

    B.  This Market Has Characteristics That Make It Susceptible to Collusion. .................. 14

    C.  Casino-Hotel Defendants Previously Priced Rooms Based on Costs, Supply and Demand. .................................................................................... 16

    D.  Rainmaker is Utilized by Casino-Hotel Defendants. .................................... 17

        i.    Casino-Hotel Defendants Rely On Rainmaker's Platform to Set Rates. ........... 21

    E.  Defendants Conspire to Fix Prices Using Rainmaker. ................................. 26

    F.  There Are Multiple Forms of Conspiracy Evidence .................................... 27

        i.    Casino-Hotel Defendants Possessed the Motive to Conspire. ........................... 27

        ii.   Defendants' Anticompetitive Scheme Effects Guestroom Rates and Revenues. ................................................................................... 29

        iii.  Casino-Hotel Defendants Undertook Actions Against Their Own Interests. ..... 33

        iv.   Defendants' Scheme Does Not Benefit the Market. ........................................... 34

        v.    Traditional Conspiracy Evidence Is Also Present. ............................................. 34

V.      FRAUDULENT CONCEALMENT ........................................................ 43

VI.     CLASS ALLEGATIONS ........................................................................................... 45

VII.    CLAIMS FOR RELIEF ........................................................................................... 48

PRAYER FOR RELIEF ................................................................................................. 50

JURY TRIAL DEMAND ................................................................................................ 51

## LOCAL CIVIL RULE 10.1 STATEMENT

Pursuant to Local Civil Rule 10.1(b), the required information for Plaintiff's counsel of record is provided above on the first page of the Complaint.

Pursuant to Local Civil Rule 10.1(a), the names and addresses of the Parties to this action are:

1.   Plaintiff Monica Blair-Smith resides at 1400 S. 24th St., Philadelphia, PA 19146.

2.   Defendant Boardwalk 1000, LLC d/b/a Hard Rock Hotel & Casino Atlantic City has its principal place of business at 1000 Boardwalk, Atlantic City, New Jersey 08401.

3.   Defendant Boardwalk Regency LLC d/b/a Caesars Atlantic City Hotel & Casino has its principal place of business at 2100 Pacific Avenue, Atlantic City, New Jersey 08401.

4.   Defendant Caesars Entertainment, Inc. has its principal place of business at 100 West Liberty Street, 12th Floor, Reno, Nevada 89501.

5.   Defendant Cendyn Group, LLC has its principal place of business at 980 N. Federal Highway, 2nd Floor, Boca Raton, Florida 33432.

6.   Defendant Hard Rock International Inc. has its principal place of business at 5701 Stirling Road, Davie, Florida 33314.

7.   Defendant Harrah's Atlantic City Operating Company, LLC d/b/a Harrah's Resort Atlantic City Hotel & Casino has its principal place of business at 777 Harrah's Boulevard, Atlantic City, New Jersey 08401.

8.   Defendant Marina District Development Company, LLC d/b/a Borgata Hotel Casino & Spa has its principal place of business at 1 Borgata Way, Atlantic City, New Jersey 08401.

9.   Defendant MGM Resorts International has its principal place of business at 3600 Las Vegas Boulevard South, Las Vegas, Nevada 89109.

10.   Defendant Seminole Hard Rock Support Services, LLC has its principal place of business at 5701 Stirling Road, Davie, Florida 33314.

11.   Defendant Tropicana Atlantic City Corporation d/b/a Tropicana Casino and Resort Atlantic City has its principal place of business at 2831 Boardwalk, Atlantic City, New Jersey 08401.

Plaintiff Monica Blair-Smith ("Plaintiff") brings this action individually and on behalf of a class of all others similarly situated against Defendants,[1] and alleges the following:

## I.      NATURE OF THE ACTION

1.      For years, Defendants have been conspiring to fix, raise and stabilize the prices of guestrooms in their Atlantic City casino-hotel properties. Coordinated use of Defendant Cendyn's Rainmaker platform has led to Plaintiffs and class members paying supra-competitive prices for guestrooms. Defendants' scheme is in violation of Section 1 of the Sherman Act and began no later than June 27, 2018 and continues to the present ("Class Period").

2.      Atlantic City, NJ is a tourist mecca for gambling, entertainment, and dining on the east coast. And while visitors have several lodging options available to them, casino-hotels are undoubtedly the most appealing. This is because, unlike traditional hotels and other types of lodging (i.e.: AirBnbs), casino-hotels provide guests with access to gambling, shows, concerts, award-winning dining, and more – all under one roof. Add to that Atlantic City's famous beach and boardwalk just steps away, and casino-hotels attract thousands of visitors each year.

3.      Most of the casino-hotel properties in Atlantic City are owned and operated by the Casino-Hotel Defendants, with many having been in Atlantic City for decades. In fact, the Casino-Hotel Defendants collectively possess at least a 72% market share of rentable rooms amongst casino-hotels in Atlantic City (the "Atlantic City Casino-Hotel Market ").

4.      For casino-hotel Defendants, higher occupancy rates translate to higher onsite

---

[1] "Defendants" collectively references Cendyn Group ("Cendyn") and predecessor The Rainmaker Group ("Rainmaker"), and the Casino-Hotel Defendants that use its pricing algorithm. References to Cendyn incorporate Rainmaker unless expressly noted otherwise or the context makes clear. "Casino-Hotel Defendants" references the corporate parent defendants, Caesars Entertainment, MGM Resorts and Hard Rock International, and their respective Atlantic City casino-hotels. The Caesars Entertainment casino-hotels are Caesars Atlantic City (including Caesars Suites Atlantic City), Harrah's Atlantic City, Tropicana Atlantic City and, for the first two and a half years of the Class Period, Bally's Atlantic City. The MGM Resorts casino-hotel is Borgata (including the Water Club at Borgata). The Hard Rock International casino-hotel is Hard Rock Atlantic City.

gambling revenues, which are the driving force of casino-hotels profitability. Thus, in an effort to draw in visitors and maximize gaming revenues, Casino-Hotel Defendants have traditionally competed for guests by offering competitive rates on guestrooms based on basic economic principles, supply, and demand.

5.      But this all changed when Rainmaker, later acquired by Defendant Cendyn, and began offering its hospitality clients a way to maximize profits derived from guestrooms – all without having to compete on rates. Rainmaker developed and marketed several pricing algorithm products ("Rainmaker platform") designed to help hospitality clients, including the Casino-Hotel Defendants, recapture "lost" guestroom revenues. First, each client inputs its current and non-public pricing and occupancy data. Next the Rainmaker platform collects, processes, and analyzes this information across all its hospitality clients in a given market in real time, then generates daily recommended guestroom rates to its clients. Clients, including Casino-Hotel Defendants, are *strongly* encouraged to implement the rates that the Rainmaker platform generates. The Rainmaker platform thus eliminates traditional competitive rate-setting, in favor of rate setting using aggregated non-public data across competitors.

6.      Rainmaker quickly gained popularity among casino-hotel operators and eventually became the self-proclaimed "market leader" in the space until industry giant Cendyn acquired it. Cendyn now calls the Rainmaker platform "the hotel revenue and profit optimization cloud."[2]

7.      Three products comprise the current Rainmaker platform: GuestREV, REVCaster, and GroupREV. GuestREV forecasts market demand and recommends optimal rates for hospitality clients to charge on individual rooms. GroupREV performs this same function for large group

---

[2] Press Release, Cendyn, *Cendyn announces acquisition of The Rainmaker Group* (Aug. 1, 2019), https://www.cendyn.com/news/cendyn-announces-acquisition-of-the-rainmaker-group/#:~:text=the%20hotel%20revenue%20and%20profit%20optimization%20cloud.

bookings. REVCaster, which Rainmaker acquired from a competitor in 2015, enables its users to monitor each other's room rates and "solve" the dilemma of guests' "competitor rate shopping."[3]

8.      Cendyn claims that "we have seen returns of up to 15%" by using the Rainmaker platform.[4] These increased revenues drive Cendyn's clients' adoption of the algorithm's recommended room rates. In fact, Cendyn boasts that clients adopt the algorithm's recommended room rates – of which clients like Casino-Hotel Defendants each receive hundreds of thousands per year – more than half of the time.

9.      Given these statistics, a manager from one Casino-Hotel Defendant's revenue management team stated that she "can't see getting by without [the Rainmaker platform]." Another manager claimed, "it's indispensable."[5]

10.      Casino-Hotel Defendants began using the Rainmaker platform at various times in the Atlantic City Casino-Hotel Market preceding the Class Period. By June 27, 2018, the Casino-Hotel Defendants, which were recovering from years of financial hardships, had the means, motive, and (importantly) the market power to fully utilize the Rainmaker platform to change their collective fortunes.

11.      Starting no later than June 2018, Casino-Hotel Defendants—with Rainmaker's (and later Cendyn's) active participation, promotion and coordination—knowingly used the Rainmaker platform to fix, stabilize, and artificially inflate guestroom rates. In doing so, Casino-Hotel Defendants successfully replaced a historically independent room pricing system in Atlantic City with a collusive one.  Room revenue data reported to the New Jersey Casino Control Commission

---

[3] Press Release, Rainmaker, *The Rainmaker Group Acquires Revcaster LLC* (Mar. 17, 2015), https://www.prweb.com/releases/2015/03/prweb12587845.htm.
[4] *Tom Walker Returns to The Rainmaker Group*, TRAVEL COMMUNICATION (Jan. 25, 2012), https://travelcommunication.net/people/tom-walker-returns-to-the-rainmaker-group/.
[5] Cendyn, *Borgata Hotel Casino & Spa's success with Guestrev* (Nov. 3, 2011), https://www.cendyn.com/customer-stories/borgata-hotel-success-rainmaker-guestrev/.

("NJCCC") during and before the Class Period show notable decreases in occupancy rates alongside substantial increases in room rates and revenues. Even more telling is that this same data reveals much lower increases in casino gaming revenues from the same period.

12.     The increased revenues are a result of Casino-Hotel Defendants' willful usage of the Rainmaker platform to facilitate charging supra-competitive room rates during the Class Period.

13.     High-level Rainmaker and Cendyn personnel encouraged wide-spread and coordinated use of the Rainmaker platform, and executives at Casino-Hotel Defendants were all too eager to participate in the scheme. Cendyn was able to assure each Casino-Hotel Defendant that its co-conspirators would not undercut their room rates to take share (i.e., what would have happened under normal competitive conditions).

14.     In fact, knowing that coordination is key, Cendyn outright instructed its clients to practice pricing discipline and "not [to] chas[e] after occupancy growth,"[6] while advocating that clients should "avoid the infamous 'race to the bottom' when competition inevitably becomes fierce within a market."[7]

15.     Beyond this direct evidence of collusion, there exists compelling circumstantial evidence which, when considered together with Defendants' parallel conduct, demonstrates anticompetitive conduct.

16.     First, the financial setbacks in the years leading up to the Class Period combined with the characteristics of the Atlantic City Casino-Hotel market motivated Defendants to

---

[6] Dan Skodol, *Science Based Hotel Revenue Management Surpasses Fiction of Rules Based Models*, REVENUE HUB (May 9, 2018), https://revenue-hub.com/hotel-revenue-management-models/.
[7] Dan Skodol, *Managing capacity constraints in a COVID-19 world*, HOSPITALITY NET (May 20, 2020), https://www.hospitalitynet.org/opinion/4098784.html.

conspire. Second, Casino-Hotel Defendants acted against their individual economic self-interests by implementing the Rainmaker platform's recommended guestroom rates. And finally, the following traditional conspiracy evidence tends to demonstrate a price-fixing conspiracy: a radical change in business practices; the adoption of a common course of action; opportunities to conspire during industry events and smaller bilateral meetings; and Casino-Hotel Defendants' exchange of competitively sensitive pricing and capacity data by and through Cendyn.

17.     The effects of Defendants' scheme are inevitable and familiar. A recent economic study confirmed that the use of a similar algorithm in concentrated markets "during boom" periods enabled users to increase prices more than non-users and concluded that such patterns are consistent with collusion.[8] And a former Federal Trade Commission Chair equated this conduct to a traditional "hub-and-spoke conspiracy."[9] This conduct produces clear anticompetitive effects and offers no procompetitive benefits.

18.     Plaintiff brings this suit on behalf of a class of all persons who directly rented hotel rooms from any Casino-Hotel Defendant or co-conspirator in Atlantic City during the Class Period to recover all damages and injunctive relief available under federal antitrust law.

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises out of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

20.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and New Jersey's long-

---

[8] Sophie Calder-Wang & Gi Heung Kim, *Coordinated vs Efficient Prices: The Impact of Algorithmic Pricing on Multifamily Rental Markets* (Mar. 28, 2023), available at SSRN: https://ssrn.com/abstract=4403058.
[9] *Id.*

arm statute, N.J. CT. R. 4:4-4.

21.   Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, may be found in and transact business in the forum state, including the rental of casino-hotel rooms.

22.   Defendants, directly or through their divisions, subsidiaries, predecessors, agents, or affiliates, engage in interstate commerce in the rental of casino-hotel rooms.

23.   Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendant maintains business facilities, has agents, transacts business, and is otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## III.   THE PARTIES

### a.   Plaintiff

24.   Monica Blair-Smith. Plaintiff Monica Blair-Smith ("Plaintiff") is a citizen and resident of the State of Pennsylvania. Plaintiff directly rented a room from one or more Casino-Hotel Defendants during the Class Period, including within the four years preceding the filing of this Complaint.

25.   For example, on or about March 20, 2023, Plaintiff reserved multiple guestrooms at the Tropicana Atlantic City Hotel and Casino, which she directly rented and paid for through Caesars Entertainment's online booking platform. Plaintiff stayed overnight in a guest room at Tropicana Atlantic City.

26.   Plaintiff paid higher prices for the casino-hotel rooms she rented directly from Casino-Hotel Defendants as a result of the antitrust violations alleged in this Complaint. In addition, Plaintiff may directly rent guest rooms in Atlantic City, New Jersey, operated by one or

more Casino-Hotel Defendants in the future.

      **b. Defendants**

27.    **<u>Caesars Entertainment Defendants.</u>** Defendant Caesars Entertainment, Inc. ("Caesars Entertainment") is a publicly traded Delaware corporation headquartered in Reno, Nevada.

28.    Caesars Entertainment, through wholly owned subsidiary Caesars Entertainment Operating Company, LLC, operates Defendant Boardwalk Regency LLC d/b/a Caesars Atlantic City Hotel & Casino ("Caesars Atlantic City"), Defendant Harrah's Atlantic City Operating Company, LLC d/b/a Harrah's Resort Atlantic City Hotel & Casino ("Harrah's Atlantic City"), and Defendant Tropicana Atlantic City Corporation d/b/a Tropicana Casino and Resort Atlantic City ("Tropicana Atlantic City"). Caesars Entertainment leases these casino-hotels' real estate from VICI Properties ("VICI").

29.    Defendant Caesars Atlantic City is a New Jersey corporation headquartered in Atlantic City, New Jersey. Caesars Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey during the Class Period. Caesars Atlantic City includes Caesars Suites Atlantic City, a property adjacent to Caesars Atlantic City that offers guests upscale suites and VIP amenities.

30.    Caesars Atlantic City and Caesars Suites Atlantic City are collectively referenced in this Complaint as "Caesars Atlantic City."

31.    Defendant Harrah's Atlantic City is a New Jersey corporation headquartered in Atlantic City, New Jersey. Harrah's Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the Class Period.

32.    Defendant Tropicana Atlantic City is a New Jersey corporation headquartered in

Atlantic City, New Jersey. Tropicana Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the Class Period.

33.     Caesars Entertainment and its Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City casino-hotels are clients of Cendyn and have used its Rainmaker platform during the Class Period.

34.     **Hard Rock Defendants**. Defendant Hard Rock International, Inc. ("Hard Rock International") is a Florida corporation headquartered in Davie, Florida. The Seminole Tribe of Florida has wholly owned Hard Rock International since 2006.

35.     Hard Rock International, through wholly owned subsidiary Hard Rock Tristate AC, LLC, owns and operates Defendant Boardwalk 1000, LLC d/b/a Hard Rock Hotel & Casino Atlantic City ("Hard Rock Atlantic City").

36.     Defendant Seminole Hard Rock Support Services, LLC ("Seminole Hard Rock") is a Florida limited liability company headquartered in Davie, Florida.

37.     Defendant Hard Rock Atlantic City is a New Jersey limited liability company headquartered in Atlantic City, New Jersey. Hard Rock Atlantic City has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the Class Period.

38.     Hard Rock International and its Hard Rock Atlantic City casino-hotel are clients of Cendyn and, with active assistance and coordination by Seminole Hard Rock, have used the Rainmaker platform during the Class Period.

39.     **MGM Resorts Defendants.** Defendant MGM Resorts International ("MGM Resorts") is a publicly traded Delaware corporation headquartered in Las Vegas, Nevada.

40.     MGM Resorts, through wholly owned subsidiary Marina District Development Holding Company LLC, operates Defendant Marina District Development Company, LLC d/b/a

Borgata Hotel Casino & Spa ("Borgata"), and leases this casino-hotel's real property from VICI.

41.     MGM Resorts acquired Boyd Gaming Corporation's ownership interest in Borgata in August 2016. That same fall, MGM Growth Properties acquired Borgata's real property from MGM Resorts and leased that property to the MGM Resorts subsidiary, Marina District Development Holding Company LLC, that would operate the property. In August 2021, VICI announced it would acquire MGM Growth Properties, including its Borgata real property holding. That acquisition closed in April 2022.

42.     Defendant Borgata includes The Water Club at Borgata, a hotel connected to Borgata that was built in 2008. On March 14, 2023, Borgata announced that The Water Club would be renamed MGM Tower, and that a corresponding renovation would be done by Memorial Day 2023.

43.     Defendant Borgata is a New Jersey corporation headquartered in Atlantic City, New Jersey. Borgata has rented hotel rooms directly to guests in Atlantic City, New Jersey, during the Class Period.

44.     Borgata and The Water Club are collectively referenced herein as "Borgata."

45.     MGM Resorts and its Borgata casino-hotel are clients of Cendyn and have used the Rainmaker platform during the Class Period.

46.     **Cendyn.** Defendant Cendyn Group, LLC is a Delaware corporation headquartered in Boca Raton, Florida, with additional domestic offices in Las Vegas, Nevada, Alpharetta, Georgia, and San Diego, California.

47.     Cendyn acquired Rainmaker and its underlying hotel room pricing algorithm platform in August 2019 and subsequently operated it as a subsidiary called "Rainmaker, a Cendyn company" for a relatively short period of time before fully absorbing it.

48.     Various persons and entities known and unknown to Plaintiff and not presently named as defendants in this action have participated as co-conspirators with Defendants in the alleged anticompetitive conduct and have performed acts and made statements in furtherance thereof.

49.     The relevant antitrust market is the Atlantic City Casino-Hotel Market. The industry does not dispute its existence. Industry observers and participants, including Casino-Hotel Defendants themselves, share this position, and fundamental economic principles confirm it.

## IV.     GENERAL ALLEGATIONS

### A.  The Relevant Market is the Atlantic City Casino-Hotel Market.

50.     Since 1976, Atlantic City has held the exclusive right to operate casinos in New Jersey. Pursuant to authority granted them under the New Jersey Casino Control Act, the New Jersey Division of Gaming Enforcement ("NJDGE") and the NJCCC regulate the industry by overseeing the city's casino-hotels.

51.     The market definition alleged in this litigation has been recognized and used by New Jersey gaming regulators. For example, in July 2020, the NJCCC approved the Eldorado Resorts-Caesars Entertainment merger after Caesars Entertainment agreed to divest Bally's Atlantic City to "reduce[] concerns about 'undue economic concentration'" in the Atlantic City casino market.[10]

52.     In fact, during these proceedings, Caesars Entertainment's own expert economist applied the same market definition to analyze the effect of the proposed merger within the Atlantic

---

[10] Ken Ritter, *New Jersey regulators mulling Eldorado buyout of Caesars*, WASH. POST (Jul. 16, 2020), https://www.washingtonpost.com/business/new-jersey-regulators-mulling-eldorado-buyout-of-caesars/2020/07/16/7abd2168-c7ad-11ea-a825-8722004e4150_story.html.

City market.[11]

53.     Within the Atlantic City Casino-Hotel Market, the relevant product market is hotel rooms for rent in casino-hotels, and the relevant geographic market is Atlantic City.

### i. The Casino-Hotel Market is Dominated By the Casino-Hotel Defendants.

54.     Together Casino-Hotel Defendants possessed a dominant share of the rentable guestrooms amongst Atlantic City casino-hotel properties during the Class Period.

55.     Casino-Hotel Defendants possessed an 80% market share between June 27, 2018, and November 16, 2020. These dates correspond with the opening date of Hard Rock Atlantic City and the day preceding Caesars Entertainment's sale of Bally's Atlantic City, respectively. Since the latter date, Casino-Hotel Defendants have possessed a 72% market share.

56.     Statistics published by the NJDGE and the NJCCC show that, across Atlantic City's nine casino-hotel properties, there have been around 15,109 guestrooms available for rent during the Class Period.

57.     Defendant Borgata operates 2,767 rooms in the Atlantic-City Casino-Hotel Market, giving it an 18.3% market share during the Class Period.

58.     Hard Rock International's Atlantic City casino-hotel has 1,971 rooms, giving it a corresponding market share of 13.1% during the Class Period.

59.     Caesars Entertainment possesses the largest market share in casino-hotels across its properties in Atlantic City. Collectively its casino-hotels have had 4,939 guestrooms with a corresponding market-share of 48.3% between June 27, 2018, and November 16, 2020, and 6,0998

---

[11] Timothy Watts, *Economic Analysis of the Competitive Effects of the Proposed Merger of Caesars Entertainment Corp. with Eldorado Resorts, Inc. on Atlantic City Casino Operations: First Amendment to Analysis of September 6, 2019*, State of New Jersey Casino Control Commission (May 13, 2020).

guestrooms with a corresponding market share of 40.3% from November 17, 2020, through the present.

### ii.  The Relevant Product Market is Casino-Hotel Rooms.

60.    Casino-hotel rooms possess several characteristics that distinguish them from rooms in traditional hotels, resorts, and other forms of rental lodging (such as AirBnBs). Thus, they occupy their own product market.

61.    *First*, Guests stay at casino-hotels to take advantage of their full and varied gambling offerings; fine-dining restaurants, bars and nightclubs; entertainment options like concerts, shows, and athletic events; full-service gyms, pools and spas; a wide array of retail shops; and conference facilities capable of hosting meetings of any size and duration – all in a single location.

70.    Indeed, Casino-Hotel Defendants advertise these amenities as making them unique in the hospitality industry. MGM Resorts' Borgata calls itself a "Luxury Destination and market-leading casino resort, offering an unparalleled travel and entertainment experience" with (but not limited to) "2,000 luxurious hotel rooms and suites…900-seat Music Box theater; Premier nightclub… 11 retail boutiques; 13 fine dining and casual restaurants; Spa Toccare", all in one building.[12] Hard Rock similarly highlights the attractions of its Hard Rock Atlantic City venue, claiming "there's no shortage of variety" offering guests an experience "unlike any other:"[13]

62.    *Second*, Casino-Hotel Defendants consider their competition to be other casino-hotels, not traditional non-casino accommodation offerings. Caesars Entertainment's 2021 annual report discusses the competitive environment it faces within "the casino entertainment business,"

---

[12] About Borgata Hotel Casino & Spa,  https://newsroom.mgmresorts.com/borgata-hotel-casino-spa-celebrates-momentous-20th-anniversary.htm#:~:text=About%20Borgata%20Hotel%20Casino%20%26%20Spa
[13] Hard Rock Atlantic City Hotel and Casino, https://www.hardrockhotelatlanticcity.com/hotel-and-casino.

adding that "[i]n most regions, we compete directly with other casino facilities operating in the immediate and surrounding areas."[14]

63.     Industry commentators and participants also consider casino-hotels to occupy their own relevant product market. One commentator noted, "[c]asino hotels, which combine lodging with gaming operations, are a particular sector in the lodging industry."[15] According to another commentator, this is because casino-hotels do not compete against non-casino lodging facilities. Instead, casino-hotels "exist to serve casino patrons and boost casino demand," thus casino-hotels' "primary competitors are other casino hotels."[16]

64.     Casino-hotels are even distinct entities in the eyes of the law. For one, the definition of "hotel" is codified under the Hotel and Multiple Dwelling Law, while "casino-hotel" carries a distinct and different definition under the Casino Control Act. One court held that "casino hotels are not conventional hotels" because "the nature of the casino business, even with overnight accommodations available, is vastly different from that of a conventional hotel." *Atlantic City v. Ace Gaming, LLC*, 23 N.J. Tax. 70, 88-89 (2006).

### iii.   The Relevant Geographic Market is Atlantic City.

65.     Industry analysts, courts, and Casino-Hotel Defendants themselves describe Atlantic City as an economically separate and distinct geographic area.

66.     According to New Jersey's state tourism division, "Atlantic City holds the distinction of being the East Coast's gaming and resort capital."[17]

67.     The American Gaming Association, whose "membership includes commercial and

---

[14] Caesars Entertainment, Inc., 2021 Annual Report (Form 10-K) (Feb. 24, 2022).
[15] Hyewon Youn & Zheng Gu, The Impact of the Recent Recession on U.S. Lodging Firms: An Examination Based on Ratio Analysis, 18 The Journal of Hospitality Financial Management (2010).
[16] James M.Klas, *Why Casino Hotels Work*, Klas Robinson QED (Oct. 1, 2018), http://www.klasrobinsonqed.com/wp-content/uploads/2019/03/IGMag201810_Klas.pdf.
[17] *Atlantic City Casino Resorts*, VISITNJ.ORG (2023), https://visitnj.org/article/atlantic-city-casino-resorts.

tribal casino operators" and "other key stakeholders in the gaming industry,"[18] identified Atlantic City as the number two geographic market in the United States' "Top Casino Markets."[19]

68.     In a June 2022 press release, Caesars Entertainment announced a new investment in "the Atlantic City market."[20]

69.     Atlantic City is recognized as a proper geographic market by New Jersey Courts. New Jersey's state Tax Court uses "the Atlantic City casino-hotel market" and "other casino hotels in Atlantic City" markets when analyzing property valuations. *Marina District Development Co., LLC v. Atlantic City*, 27 N.J. Tax. 469, 475-77, 484, 489, 504 (2013); *Ace Gaming, LLC*, 23 N.J. Tax. at 127.

### B.  This Market Has Characteristics That Make It Susceptible to Collusion.

70.     The Atlantic City Casino-Hotel Market is susceptible to collusion.  It possesses multiple factual enhancements or "plus factors" along with parallel pricing that allow for the formation and implementation, of the conspiracy.

71.     First, The Atlantic City Casino-Hotel Market possesses structural characteristics that are common in industries plagued by collusion: high entry barriers, high market concentration, lack of reasonable substitutes, and product fungibility.

72.     There are significant barriers to entering the Atlantic City Casino-Hotel Market. First, the amount of capital investment required to build and operate a casino-hotel is substantial, to say the least. Land acquisition and construction alone can cost more than a billion dollars; the

---

[18] *About*, AMERICAN GAMING ASSOCIATION (2023), https://www.americangaming.org/about/.
[19] Press Release, American Gaming Association, 2022 Commercial Gaming Revenue Tops $60B (Feb. 15, 2023), https://www.americangaming.org/new/2022-commercial-gaming-revenue-tops-60b-breaking-annual-record-for-second-consecutive-year/.
[20] Press Release, Ceasars Entertainment, *Caesars Entertainment Announces Additional Property Enhancements at Ceasars Atlantic City* (Jun. 7, 2022), https://www.caesars.com/meetings/press/caesarsentertainmentannouncesadditionalpropertyenhancementsatcac.

number and quality of the amenities necessary to make the property competitive drives these expenditures. Even acquiring an existing resort requires hundreds of millions of dollars to revamp and rebrand.

73.     For example, the construction of the Trump Taj Mahal cost over $1 billion dollars over 30 years ago. And Hard Rock International invested more than $500 million renovating the property before re-opening it as the Hard Rock Atlantic City in 2018. Caesars Entertainment is set to spend approximately $400 million renovating Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City. And MGM Resorts spent $400 million building the Water Club at the Borgata in 2008 – this is after spending $1.1 billion to build the Borgata a mere five years earlier.

74.     Building costs are not the only barrier. The NJCCC requires Atlantic City Casino-Hotel Market entrants to meet certain qualifications to receive authorization to open. "Applicants must establish, among other things, their financial stability, integrity, responsibility, business ability and experience necessary to establish and maintain a successful, efficient casino operation."[21]

75.     And of course, casino-hotels incur substantial operating costs: paying hosts of staff and workers, licensing costs (both for occupancy and gaming), and state, local and federal taxes, and maintaining the property.

76.     As previously discussed, the Atlantic City Casino-Hotel Market is highly concentrated. There are nine casino-hotels in the market, with Casino-Hotel Defendants owning between five and six of them during the Class Period. This means Casino-Hotel Defendants own between 72% and 80% of the rentable guestrooms in the Atlantic City Casino-Hotel Market.

---

[21] 2018 NJCCC Annual Report, https://www.nj.gov/casinos/about/reports/pdf/2018_ccc_annual_report.pdf.

77.     The demand for guestrooms in the Atlantic City Casino-Hotel Market is inelastic: the rate at which customers rent these rooms is relatively static, regardless of the price of those rooms. This is because, as discussed, casino-hotel guestrooms are not substitutable for other kinds of guestroom in Atlantic City. There are limited, if any, low-cost alternatives to guestrooms in casino-hotels due to the amenities that casino-hotels offer: guests do not have on-site access to world-class dining, spa facilities, or gambling facilities in traditional hotels, inns, or AirBnBs. Thus, even when Casino-Hotel Defendants increase room prices, the risk of losing a meaningful number of guests to other types of lodging is negligible. And this risk is certainly not significant enough to police the market or discourage anticompetitive behavior, such as the Casino-Hotel Defendants' price-fixing conspiracy.

78.     Although casino-hotels provide unique offerings, their guestrooms are generally substitutable as amongst each other. For example, a guest looking to rent a large room with two Queen-sized beds and access to in-house restaurants, penny slots, and dance clubs could stay at any of the Casino-Hotel Defendant properties.

### C.  Casino-Hotel Defendants Previously Priced Rooms Based on Costs, Supply and Demand.

79.     Historically, casino-hotels engaged in competitive pricing strategies. Guestrooms were priced based on each casino-hotels' own costs, supply and demand forecasts, and market assessment.

80.     Guest rooms are offered directly to guests via phone and through Casino-Hotel Defendants' respective online booking platforms. Typically, guests may book a room by visiting the casino-hotel's (or its parent company's) online booking platform, selecting the specific resort, desired date range, number of guests, and room type, and completing payment with a credit card or other digital payment mode.

81.     Guest rooms are also directly sold to guests through arrangements with online travel agencies ("OTAs") like Booking Holdings, Expedia Group, and TripAdvisor. OTAs use an agency model, whereby the guest using the OTA is sent to the casino-hotel's website to reserve the room at the rate set by the casino-hotel. The guest pays the casino-hotel directly at checkout. A commission based on the total value of the booking either at the time of booking or after an agreed-upon time period is paid to the OTA by the casino hotels.

82.     Class members (as defined *infra* ¶196) purchased rooms from one or more Casino-Hotel Defendants using one or both methods of direct purchase.

83.     The hospitality industry is a capital-intensive industry, and casino-hotels in particular require immense capital to build up their amenity heavy facilities. Because an empty hotel room is lost revenue, it follows that hotel and casino-hotels strive to maximize their occupancy rates. This is typically done by granting concessions, lowering prices, or offering incentives or deals to attract customers.

84.     Even further, an empty hotel room is also a loss of gambling revenue because most revenue and profits derive from casino-hotels' casino operations. Therefore, rational profit-maximizing firms seek to acquire as many rooms as possible so each guest can spend money on gaming. Therefore, casino-hotels in a competitive market have even more incentive than non-casino-hotels to maximize capacity to retain guest by offering significantly reduced or free rooms.

### D.  Rainmaker is Utilized by Casino-Hotel Defendants.

85.     The Rainmaker Group ("Rainmaker") was started in the late 1990s by Bruce Barfield and Tammy Farley. Rainmaker developed and sold pricing algorithm products to owners and operators in the apartment and hospitality industries, declaring itself the "market leader in

profit optimization solutions for the Gaming & Hospitality and Multifamily Housing industries."[22]

86.    Rainmaker believed that the competitive room pricing model traditionally used by casino-hotels was not fully capturing potential revenues. In a 2017 press release ahead of an annual industry conference, Rainmaker pointed out that because casino-hotel revenues are driven by gambling and not room revenues, "casino hotels have traditionally left money on the table by over-discounting and comping rooms without the real-time data to back up those decisions."[23]

87.    To address this, Rainmaker developed a "total revenue management approach" premised on "dynamic pricing" that did away with the traditional method of so-called "fixed pricing."[24] Rainmaker's aim was to allow operators like Casino-Hotel Defendants to extract uncaptured, additional revenue from their guests.

88.    Each casino-hotel client continuously feeds the platform its current, non-public room pricing and occupancy data. The algorithm collects this data from its clients (and their competitors) and continuously processes and analyzes this information, along with other relevant supply and demand-related data. With this continuous flow of real-time data, the algorithm obtains a clear and complete picture of market supply and demand and competitive dynamics at any given time. Then the algorithm uses this information to generate and recommend "optimal" room rates to its clients. These recommendations are updated throughout a given day.

89.    The Rainmaker platform consists of three separate but interrelated products: GuestREV, GroupREV, and REVCaster.

---

[22] Press Release, Rainmaker, *Dover Downs Hotel & Casino Selects Rainmaker revolution™ Profit Optimization Solution* (Mar. 20, 2012), https://www.hospitalitynet.org/news/4055368.html.
[23] Press Release, Rainmaker, *The Rainmaker Group to Present Total Revenue Management Approach for Casino Hotels at INFORMS 2017* (Mar. 29, 2017), https://www.hotel-online.com/press_releases/release/the-rainmaker-group-to-present-total-revenue-management-approach-for-casino/.
[24] *Id.*

90.     GuestREV[25] caters specifically to the casino-hotel sector and, according to Rainmaker, "is the market-leading revenue management and profit optimization solution for forecasting and pricing hotel rooms,"[26] GuestREV forecasts and recommends the guestroom rates for clients like Casino-Hotel Defendants by, among other activities, processing and analyzing the room rates that the specific client and each client-competitor charges.

91.     GuestREV "employs the most accurate valuation of [guests'] true revenue potential at the segment level."[27] According to Cendyn President and Chief Marketing Officer Michael Bennett, GuestREV uses "[c]ompetitor rates … to influence the final price recommendation so hotels don't leave money on the table by pricing too far below competitors[.]"[28]

92.     Casino-Hotel Defendants get optimal recommended room generated by GroupREV. It is an important tool for casino-hotels because group business can represent up to 40% or more of revenue potential for casino-hotels.

93.     GroupREV also forecasts demand for group-booking customers, i.e. individuals attending conferences or weddings, "by day and by group segment."[29]

94.     REVCaster, the third and final product in Rainmaker's price algorithm platform, is Rainmaker's solution to guests that engage in competitive room rate shopping. This product helps clients like Casino-Hotel Defendants by "collect[ing] market-specific hotel price information" from clients' competitors and "provide[ing] easy-to-use reports and data downloads that increase

---

[25] Rainmaker also released a mobile version of the GuestREV product in March 2015 which, "enables anywhere-anytime access to the complete GuestREV pricing functions and reports in real-time via smartphone or tablet."
[26] Press Release, Rainmaker, *Rainmaker Group Takes Gold in 16th Annual GGB Gaming & Technology Awards* (Sep. 29, 2016), https://www.hospitalitynet.org/news/4078527.html.
[27] https://www.cendyn.com/guestrev/.
[28] Andrea Victory, *Examing Trends in Rate and Revenue Management*, HOTELIER MAGAZINE (Jan. 3, 2020), https://www.hoteliermagazine.com/examining-trends-in-rate-and-revenue-management.
[29] *The Rainmaker Group introduces group forecasting,* HOTEL MANAGEMENT (Mar. 14, 2017), https://www.hotelmanagement.net/tech/rainmaker-group-introduces-group-forecasting.

revenue for clients."[30]

95.     GuestREV, GroupREV and REVCaster work together to significantly increase Rainmaker's users' guestroom revenues. As noted by then-Director of Sales for Gaming & Hospitality Tom Walker in January 2012, to an audience of existing and potential gaming clients that "Rainmaker boosts revenues up to 15%" for those using its platform.[31] And the acquisitions of REVCaster and GroupREV a few years later have only increased these numbers.

96.     Cendyn, acquired Rainmaker in August 2019.  The Cendyn-Rainmaker transaction closed in or around October 2019.

97.     At the time of the acquisition, Cendyn noted that Rainmaker "will enable [it] to drive performance across all aspects of the hotel business, now including revenue management" and "will enable thousands of hotels, resorts and casinos around the globe to work with one partner to power their marketing, sales and revenue performance in an integrated fashion."[32]

98.     Cendyn initially operated Rainmaker, as a subsidiary and then entirely absorbed it. With its global reach and client base (more than 30,000 properties, according to travel industry publisher Skift), Cendyn has continued to expand the adoption of the Rainmaker platform among hospitality clients, including casino-hotels.

99.     Throughout the years, both Rainmaker and Cendyn have boasted that the accuracy, precision and efficacy of the Rainmaker platform and its individual products have only improved, thus enabling clients to increase their guestroom revenues by even greater percentages. The

---

[30] Press Release, Rainmaker, *Rainmaker Group Acquires Revcaster LLC* (Mar. 16, 2015), https://www.costar.com/article/448134080/the-rainmaker-group-acquires-revcaster.
[31] Press Release, Rainmaker, *Tom Walker Returns to The Rainmaker Group to Help Drive Revenue and Profitability for Casino Hotel Operators* (Jan. 24, 2012), https://www.prweb.com/releases/therainmakergroup/directorofsales/prweb9130301.htm.
[32] Press Release, Cendyn, *Cendyn announces acquisition of The Rainmaker Group* (Aug. 1, 2019), https://www.cendyn.com/news/cendyn-announces-acquisition-of-the-rainmaker-group/.

collective use of these tools in a particular market, like the Atlantic City Casino-Hotel Market, boosts their guestroom revenues to an even higher degree.

100.    Rainmaker and Cendyn have strongly discouraged the lowering of room rates by Casino-Hotel Defendants to gain market share and grow overall revenue at their competitors' expense. In May 2018, Dan Skodol, former Cendyn VP of Data Science and Analytics and Rainmaker VP of Revenue Analytics, cautioned that "revenue managers must recognize the ultimate goal is not chasing after occupancy growth, but instead, maximizing profits across all revenue streams."[33] In other words, according to Skobol, "hotels avoid the infamous 'race to the bottom' when competition inevitably becomes fierce within a market."[34]

### i. Casino-Hotel Defendants Rely On Rainmaker's Platform to Set Rates.

101.    Caesars Entertainment in or around late 2004, began using Rainmaker's products across its "entire domestic portfolio."[35] Caesars Entertainment at the time owned Caesars Atlantic City and Bally's Atlantic City. And no later than 2009, Caesars' Harrah's Atlantic City property started using Rainmaker. In a Rainmaker January 2009, press release Entertainment stated that "our 33 properties"—which then included Harrah's Atlantic City, Caesars Atlantic City, and Bally's Atlantic City— "continue to use [Rainmaker's] revenue management system today."[36]

102.    Rainmaker press releases and promotional materials in March 2012 and 2018,

---

[33] Dan Skodol, *Science Based Hotel Revenue Management Surpasses Fiction of Rules Based Models*, REVENUE HUB (May 9, 2018), https://revenue-hub.com/hotel-revenue-management-models/.
[34] Dan Skodol, *Managing capacity constraints in a COVID-19 world*, HOSPITALITY NET (May 20, 2020), https://www.hospitalitynet.org/opinion/4098784.html.
[35] *Revenue Management a Good Bet for Caesars Entertainment*, SUPPLY & DEMAND CHAIN EXECUTIVE (Aug. 3, 2004), https://www.sdcexec.com/sourcing-procurement/news/10354367/revenue-management-a-good-bet-for-caesars-entertainment.
[36] Press Release, Rainmaker, *Casino Hotels Rely on Service and Experience from Revenue Management Providers* (Jan. 7, 2009), https://www.prweb.com/releases/therainmakergroup/letitrain/prweb1826614.htm.

highlighted Caesars Entertainment as one of its "leading casino/hotel organization"[37] and "among the top brands that rely on Rainmaker solutions are Caesars Entertainment,"[38] respectively.

103.    Indeed, all of Caesars Entertainment's Atlantic City casino-hotels have continued to use Rainmaker products.[39] Shawn Cummings, Caesars Entertainment's Revenue Manager for Enterprise Analytics from 2008 to 2014, notes on LinkedIn that he "led yield management for four properties in a highly competitive Atlantic City market" and "optimized revenue from pricing decisions made using Rainmaker GuestRev curves."

104.    In late 2009, Borgata began using Rainmaker's products. On November 11, 2009, Rainmaker "announced today that it was selected by six new casino hotels to provide its 'revolutionTM Product Suite,'" (i.e.: GuestREV, GroupREV, and REVCaster) including "The Borgata Hotel Casino & Spa."[40]

105.    Former Borgata Vice President of Information Technology John Forelli stated: "We turned to Cendyn because we knew it was the market leader in casino hotel optimization and that its system was state-of-the-art" that generates "a balanced pricing structure" where, "[a]side from setting rate minimums and maximums, the team otherwise allows GuestRev to perform its mathematical magic." The profile also quoted Sue Daigle, Borgata's Director of Revenue Management until August 2020. Daigle raved that "GuestRev is literally my right hand" and that "I can't see getting by without it" in setting room prices. [41]

---

[37] Press Release, Rainmaker, *Rainmaker Profit Optimization Solution Chosen by Revel Entertainment Group, LLC* (Mar. 29, 2012), https://www.prweb.com/releases/therainmakergroup/revel/prweb9348766.htm.
[38] 2018 Exhibitor Media Kit, Rainmaker,
https://www.hftp.org/hitec/houston/i/downloads/Exhibitor_Media_Kit__Rainmaker.pdf.
[39] Bally's Atlantic City may have stopped using Rainmaker products on or around November 17, 2020, when Caesars Entertainment sold the casino-hotel to Bally's Corporation in order to receive state regulatory clearance for the Eldorado Resorts-Caesars Entertainment merger.
[40] https://www.hotel-online.com/News/PR2009_4th/Nov09_RainmakerSix.html.
[41] Cendyn, *Borgata Hotel Casino & Spa's success with Guestrev*, https://www.cendyn.com/customer-stories/borgata-hotel-success-rainmaker-guestrev/.

106.     MGM Resorts, Borgata's corporate parent, used the Rainmaker products prior to when Borgata signed on, and continues to use the platform to date. A November 21, 2010, Hospitality Technology article noted that Rainmaker "provides revenue optimization services to companies that include . . . MGM Resorts."[42] In a press release from January 2012 and a 2018 Rainmaker "Media Kit" for example, Rainmaker highlighted MGM Resorts as one of its "leading casino/hotel organization" clients and "among the top brands that rely on Rainmaker solutions," respectively.[43]

107.     Tropicana Atlantic City began using Rainmaker products after reopening in March 2010. Gaming & Leisure Magazine's ("G&L") Fall 2015 edition, its earliest publicly available online edition, indicates that Tropicana was using Rainmaker products as of that date. Tropicana Atlantic City continued to use the Rainmaker products through the present, even though its acquisition by Eldorado Resorts in 2018 and the subsequent completion of the Eldorado Resorts-Caesars Entertainment merger on November 17, 2020.

108.     Hard Rock Atlantic City began using the Rainmaker platform almost as soon as it opened in June 2018.

109.     Borgata, Caesars Atlantic City, Harrah's Atlantic City, and Tropicana Atlantic City, and Hard Rock Atlantic City as "just a few . . . of the hotel casino brands we work with globally" to "drive profitability" through Cendyn's "integrated technology platform."[44]

110.     It was easy for a given Casino-Hotel Defendant to recognize that its competitor

---

[42] *Rainmaker Rev Mgmt System Snags Top Honors from Casino Enterprise Management*, HOSPITALITY TECHNOLOGY (Nov. 21, 2010), https://hospitalitytech.com/rainmaker-rev-mgmt-system-snags-top-honors-casino-enterprise-management.
[43] *Tom Walker Returns to The Rainmaker Group*, TRAVEL COMMUNICATION (Jan. 25, 2012), https://travelcommunication.net/people/tom-walker-returns-to-the-rainmaker-group/; *See also,* https://www.hftp.org/hitec/houston/i/downloads/Exhibitor_Media_Kit__Rainmaker.pdf at p 3.
[44] Cendyn, *Our Customers* (2023), https://www.cendyn.com/customers/.

casino-hotels were using the Rainmaker platform. Industry publications, Rainmaker and Cendyn marketing materials, attendance at Rainmaker and Cendyn-led sessions at industry events, and one-on-one meetings they had with Rainmaker and Cendyn where best pricing practices and strategies were discussed were all indications to the Casino-Hotel Defendants that their competitors were using (and, importantly, feeding) the Rainmaker platform.

111.    A leading industry publication G&L listed the Casino-Hotel Defendants as users of the Rainmaker platform during the Class Period.[45]

112.    In addition, industry events, which are well-attended by Casino-Hotel Defendants, served as opportunities for the Rainmaker and Cendyn personnel to market the Rainmaker platform, while also allowing Casino-Hotel Defendants to see which of its competitors were also using the platform.

113.    For example, Rainmaker and Cendyn personnel and Casino-Hotel Defendants' employees regularly attended G&L Roundtable. In fact, Rainmaker not only sponsored the annual meeting but also organized and sponsored G&L's annual golf outing through late 2019.

114.    Of G&L's events, Caesars Entertainment's Senior Vice President of Information Technology, Peter Broughton had this to say: "[w]hat other industry can say they gather together such a large percentage of gaming and hospitality management in one room to discuss current issues and solutions, and then allow us to network with all our vendors?" And Hard Rock Atlantic City's Vice President of Information Technology, Donald Kneisel praised "[w]ho could put a value on a meeting of all the IT leaders in our industry in one place? No politics. Just frank discussions.

---

[45] GAMING & LEISURE MAGAZINE (Fall 2015),
https://www.mydigitalpublication.com/publication/frame.php?i=275189.

Sharing thoughts, feelings, and insights. Wow!"[46]

115.    Defendants have also attended The Institute for Operations Research and the Management Sciences' ("INFORMS") annual Business Analytics Conference. At the 2017 conference, held at Las Vegas' Caesars Palace from April 2-4, Rainmaker's Farley was a keynote speaker. Rainmaker's (and later Cendyn's) Dobney hosted a "strategic session" where he "present[ed] a step-by-step approach to total revenue optimization for casino and gaming properties" …"detailing the data-driven methodology behind the total revenue management approach that has been successfully implemented by many casino properties in recent years."[47]

116.    Casino-Hotel Defendants met with Rainmaker and Cendyn representatives when they first began using the platform. During these meetings Rainmaker "share[d] industry best practices" with each Casino-Hotel Defendant while "advis[ing] of recommended business process shifts" and assisting them to "maximize the benefit of profit optimization" during platform system implementations.[48]

117.    Rainmaker also met with clients regularly to help them maximize their use of the platform.  In one press release, Rainmaker emphasized the "tight link between the companies that include[d] biweekly meetings" where a Casino-Hotel Defendant and Rainmaker "discuss[ed] ways to use the technology to meet the latest price optimization business challenges."[49]

118.    The evidence makes it clear that Casino-Hotel Defendants (with a collective 72%

---

[46] Gaming & Leisure, *2023 G&L Roundtable – October 8-9* (Jan. 23, 2022), https://mygamingandleisure.com/gl-roundtable/.
[47] Press Release, Rainmaker, *Rainmaker to Present Total Revenue Management Approach for Casino Hotels at INFORMS 2017* (Mar. 28, 2017), https://hospitalitytech.com/rainmaker-present-total-revenue-management-approach-casino-hotels-informs-2017.
[48] 2018 Exhibitor Media Kit, Rainmaker,
https://www.hftp.org/hitec/houston/i/downloads/Exhibitor_Media_Kit__Rainmaker.pdf.
[49] Press Release, Rainmaker, *Casino Hotels Rely on Service and Experience from Revenue Management Providers* (Jan. 2009), https://www.hotel-online.com/News/PR2009_1st/Jan09_RainmakerHarrahs.html.

- 80% market share in the relevant market) have all used the Rainmaker products during the Class Period, knowing each other were doing the same.

### E.  Defendants Conspire to Fix Prices Using Rainmaker.

119.    Although most Casino-Hotel Defendants were already using the Rainmaker pricing algorithm products by June 2018, the entry of a new casino-hotel operator kickstarted the conspiracy, as it firmly turned the tide and began to produce the desired results in a sustained fashion.

120.    Hard Rock Atlantic City opened on or around June 27, 2018, and immediately began using the Rainmaker platform, well aware that the other Casino-Hotel Defendants were also using the platform. Importantly, Hard Rock Atlantic City's entry into the market gave Casino-Hotel Defendants' 80% market share of rentable guestrooms in casino-hotels.

121.    The Rainmaker platform is most effective when its users knowingly make the same pricing decisions in a market in which they have combined monopoly power. That is what has occurred here: Casino-Hotel Defendants maximized their room revenues by using the Rainmaker platform and the data it collected to generate pricing.

122.    Defendants conspired to fix, raise and stabilize room rates through their willful shared use of the Rainmaker platform to empower Casino-Hotel Defendants to charge supra-competitive rates for guestrooms during the Class Period.

123.    Rainmaker and Cendyn played a central role in this anticompetitive scheme by: encouraging and coordinating Casino-Hotel Defendants' simultaneous use of the Rainmaker platform; urging Casino-Hotel Defendants to adopt the recommended "optimal" room rates and thereby facilitating charging supracompetitive guest room rates; ensured Casino-Hotel Defendants were aware of which market participants were also Rainmaker clients; shared Casino-Hotel

Defendants' non-public pricing and occupancy data through REVCaster and stressed the importance of adherence to the conspiracy and avoiding price-competition to gain market share.

124.    Casino-Hotel Defendants acted as spokes of this anticompetitive conspiracy by: using the Rainmaker platform, knowing that their co-conspirators were doing the same; feeding non-public, competitively sensitive pricing and occupancy data to the Rainmaker platform and knowing that their co-conspirators were doing the same; knowing that this data would be used to generate the same type of recommended room rates for each Hotel-Casino Defendant; accepting and implementing the recommended room rates, knowing that their co-conspirators were doing the same; and using REVCaster to monitor their co-conspirators' room rates to ensure discipline in the conspiracy.

125.    Attendance at industry events and conferences, organizational board meetings, and smaller and one-on-one meetings with Rainmaker and Cendyn allowed the Casino-Hotel Defendants to directly share information about room rate pricing strategies and practices with each other as a means to monitor compliance.

126.    Defendants' employees, including but not limited to executives and personnel involved in room pricing and technology implementation, furthered the anticompetitive pricing scheme through purposeful and coordinated use of the Rainmaker platform to set room rates and communicating amongst themselves.

### F.  There Are Multiple Forms of Conspiracy Evidence

#### i.  Casino-Hotel Defendants Possessed the Motive to Conspire.

127.    Casino-Hotel Defendants implemented this anticompetitive scheme after years of hardship in the Atlantic City Casino-Hotel Market and overall tourism industry.

128.     The Atlantic City Casino-Hotel Market's economic woes began during, and were largely caused by, the Great Recession of December 2007 to June 2009. During this time, visitors to Atlantic City casino-hotels sharply decreased, with the city having the second largest drop in gross gaming revenue of all casino markets. According to NJCCC statistics, Atlantic City casino-hotels revenues in 2009 were down 13% from 2008.[50] Casino-Hotel Defendants were not spared: Caesars Atlantic City reported gaming revenue losses of 15%, while Tropicana Atlantic City Harrah's Atlantic City, and Borgata reported 12%, 10% and 6% losses that year, respectively.[51]

129.     High ongoing debt obligations paired with low cash flow between late 2007 and 2009 caused Atlantic City Casino-Hotels to continue to struggle, even after the Great Recession ended. Even years later in 2014, the industry saw four casino-hotels shuttered, including Defendant Caesars Entertainment's' Showboat Atlantic City.

130.     In fact Caesars Entertainment's operating subsidiary, Caesars Entertainment Operating Company (CEOC), filed for bankruptcy the very next year. While "Caesars did manage to survive the recession with the help of extensive financial maneuvering and in 2012 completed a public offering of shares," it could not avoid filing for bankruptcy because "over $20 billion in debt still hung over the company and losses grew year after year."[52]And the driving force behind these losses stemmed from "regional gaming in places like Atlantic City[.]"[53]

131.     Atlantic City casino-hotels' combined total revenue remained relatively static between 2014 and 2017. There was a slight increase in revenues from 2016 to 2017, but that was

---

[50] Donald Wittkowski, *Atlantic City casino revenue off 13 percent in 2009, third straight year of decline*, THE PRESS OF ATLANTIC CITY (Jan. 11, 2010), https://pressofatlanticcity.com/news/breaking/atlantic-city-casino-revenue-off-13-percent-in-2009-third-straight-year-of-decline/article_19f64eaa-fee5-11de-9532-001cc4c002e0.html.
[51] 2009 NJCCC Annual Report,
https://dspace.njstatelib.org/bitstream/handle/10929/16183/2009_ccc_annual_report.pdf.
[52] Travis Hoium, *Caesars Bankruptcy Ignites Battle Over Company*, THE MOTLEY FOOL (Jan. 16, 2015), https://www.fool.com/investing/general/2015/01/16/caesars-bankruptcy-ignites-battle-over-company.aspx.
[53] *Id.*

driven by gaming revenue. Room rates and revenues dropped in 2017.

132.    Thus, as 2018 approached, Casino-Hotel Defendants had been bleeding money for years and were eager to head in the opposite direction as quickly as possible.

### ii.    Defendants' Anticompetitive Scheme Effects Guestroom Rates and Revenues.

133.    In 2018 Casino-Hotel Defendants' financial performance on hotel room revenue caught up to and surpassed the gaming side. This was due to sudden, significant increases in room rates and corresponding revenue, particularly as the year progressed.

134.    *The Press of Atlantic City* article in 2018 pointed out that for the first half of 2018, "the casino hotel occupancy rate was 81.4 percent, which represents a 4.4 percent decrease from [2017's] 85.8 percent. In the second quarter of 2017, the occupancy rate was 90.3 percent, compared with [2018's] 84.8 percent." Despite depressed occupancy rates, however, "[t]hrough the first half of 2018, the average [rate per occupied room] was $129.23, while the average for the first six months of 2017 was $105.56" and in Q2 2018 "the average rate was $136.01 compared with…$107.43" in the second quarter of 2017.[54]

135.    Casino-Hotel Defendants' financial performance remained strong in 2019. This was particularly true for room rates and revenues, which resulted in hotel room revenue numbers proportionally outpacing casino revenue numbers to a significant degree, even though two casino-hotels entered the market in mid-2018.

136.    The Atlantic City Casino-Hotel Market was hit particularly hard by the coronavirus pandemic that surfaced in early 2020. As an April 2022 NJDGE press release noted: "In light of

---

[54] David Danzis, *Atlantic City 2018 casino profits still lag last year*, THE PRESS OF ATLANTIC CITY (Aug. 22, 2018), https://pressofatlanticcity.com/news/casinos_tourism/atlantic-city-2018-casino-profits-still-lag-last-year/article_7b52ed20-ff31-5124-9772-1396555ebd05.html.

the casino hotel closures beginning March 16, 2020, through July 2, 2020 due to the COVID-19 pandemic and subsequent operating restrictions, the Net Revenue, Gross Operating Profit and Hotel Statistics for calendar 2021 are not comparable to 2020."[55] Consequently, 2020 was an outlier year in terms of financial metrics in this market and must be viewed accordingly.

137.   The financial performance of the Atlantic City Casino-Hotel Market, including Casino-Hotel Defendants, picked back up in 2021. In fact total gross profits from 2021 eclipsed total gross profits from pre-pandemic 2019 by more than $170 million. Higher room rates and the resulting revenue continued to drive these returns.

138.   Casino-Hotel Defendants' overall performance improved into 2022. The December 2022 LIGHT Snapshot compiled statistics from NJDGE's quarterly reports and noted of the Atlantic City gaming market that "brick-and-mortar gaming revenues for December 2022 outperformed both December 2021 ($211.82 million) and December 2019 ($208.55 million) to deliver the strongest December brick-and-mortar revenue returns in 10 years." This data also showed that room revenues Q3 2022 had increased 6.1% over those of Q3 2021, with a 14.8% increase as of September 30, 2022, over the same date in 2021. The analysis continued, "[t]his may be an indicator that the industry has recovered to pre-pandemic levels of brick-and-mortar gaming activity".[56]

As the NJDGE's April 2022 press release noted, net revenue reached $3.3 billion, "increasing 9.3% from the comparable period last year," with gross operating profits of $731.2 million.[57]

---

[55] Press Release, NJDGE, *New Jersey Division of Gaming Enforcement Announces 2nd Quarter 2021 Results* (Aug. 23, 2021), https://www.njoag.gov/new-jersey-division-of-gaming-enforcement-announces-2nd-quarter-2021-results/.
[56] Stockton University, December 2022 LIGHT Snapshot, https://stockton.edu/light/snapshots/december_2022_snapshots.html.
[57] Press Release, NJDGE, *DGE Announces Quarterly and Year End Results* (Apr. 10, 2023), https://www.nj.gov/oag/ge/docs/Financials/QuarterlyFinRpt2022/4thQTR2022PressRelease.pdf.

**Table 1. Annual Aggregate Atlantic City Casino-Hotel Market Statistics**

| Year | Casino Revenue | Delta | Room Revenue | Delta | Occupancy | Revenue per Available Room |
|---|---|---|---|---|---|---|
| 2022 | $1.78B | 0% | $698M | 13% | 73% | $130.57 |
| 2021 | $1.78B | 44% | $618M | 93% | 68% | $116.87 |
| 2020[58] | $1.21B | -28% | $317M | -48% | 62% | $85.47 |
| 2019 | $1.76B | 8% | $605M | 13% | 79% | $112.12 |
| 2018 | $1.63B | 4% | $536M | 8% | 81% | $110.65 |
| 2017[59] | $1.57B $2.56B | 2% | $495M $391M | -4% | 87% | $94.16 |
| 2016 | $2.52B | 1% | $405M | 0% | 85% | Data not available |
| 2015 | $2.50B | 3% | $406M | 1% | 81% | Data not available |

139.    The data above shows that total average room rates and corresponding revenue significantly increased during the time that all Casino-Hotel Defendants were using the Rainmaker platform to set guestroom rates. Starting no later than 3rd Quarter 2018, room revenues markedly rose, as compared to those same revenues from the prior year and in relation to corresponding casino revenue trends. All this while occupancy levels trended downward. But the rise in average daily room rates (ADR) more than compensated for the lower occupancy rates, thus causing revenue per available room (RevPAR) to rise substantially year over year.

140.    Given the unique nature of the casino-hotel market, empty rooms ultimately translate to a loss of gambling income, Casino-Hotel Defendants' true money-making operation. Thus, economic principles (and common sense) indicate that at least some Casino-Hotel Defendants would have dropped room rates to increase occupancy rates during this period, which would have resulted in less upward pricing volatility and higher occupancy rates across operators. Those likely higher occupancy rates would have almost certainly have resulted in higher room and casino revenue

---

[58] As discussed above, 2020 represents an outlier due to the impact of the COVID-19 global pandemic.
[59] The top revenue values for 2017 conform to updated standards effective January 1, 2018.

due to the additional guests staying and gambling at their casino-hotels rather than their competitors'. But this did not happen.

141.    Instead, the Casino-Hotel Defendants abandoned rational economic principles in favor of their anticompetitive scheme. And a peculiar detail of the market further highlights this point: while most Casino-Hotel Defendants saw moderate occupancy increases between 2020 and 2022, Hard Rock Atlantic City saw a sharp increase in room occupancy *and* rates. One would expect competitors to undercut Hard Rock Atlantic City on room pricing, thereby increasing their respective occupancy rates, and forcing Hard Rock to do the same and return to its prior position. But despite Hard Rock's increased occupancy rates between 2020 and 2022 (and the resultant increases in room and casino revenues), no other Casino-Hotel Defendant reacted as expected – lowering prices to increase occupancy and compete with Hard Rock.

142.    This is because they were acting under the urging of Rainmaker and Cendyn personnel. Casino-Hotel Defendants exercised discipline and, heeding Cendyn and Rainmaker executive Dan Skobol's advice, resisted the "inevitable race to the bottom" on price as seen in competitive markets. This allowed Casino-Hotel Defendants to charge higher room rates and collect higher room revenues than would have been possible absent the conspiracy. The fact that Hard Rock Atlantic City's slight deviation on occupancy levels did not start a price war further reveals Casino-Hotel Defendants' market power and the price-fixing conspiracy's efficacy.

143.    Rainmaker lived up to its name and its promises: using GuestREV and GroupREV increased Casino-Hotel Defendants' revenues each year during the Class Period. And the REVCaster tool granted Casino-Hotel Defendants unprecedented access each other's current guestroom rates, ensuring that each co-conspirator was using Rainmaker's recommended rates.

144.    The rates Class members have paid to rent guestrooms at Casino-Hotel Defendant

properties since June 27, 2018, have been purposefully artificially inflated by the Defendants. With Cendyn's active encouragement, Casino-Hotel Defendants coordinated their use of the Rainmaker platform to set guestroom rates. These actions had the intended purpose and effect of reducing legitimate competition in the Atlantic City Casino-Hotel Market.

### iii. Casino-Hotel Defendants Undertook Actions Against Their Own Interests.

145.    Fundamental principles of economics state that in a but-for world, where a minority of Casino-Hotel Defendant properties used Rainmaker's pricing algorithms and charged artificially high room prices in Atlantic City, the number of non-Rainmaker casino-hotels who continued to set their prices independently would have undercut the Rainmaker properties on room rates, filled a proportionately higher share of their rooms, attracted additional gaming revenue from their increased volume of guests, and received greater overall revenue than the Rainmaker-affiliated competitors. This is how a rational competitive market would have worked but for Defendants' conspiracy.

146.    But by adhering to the Rainmaker platform's pricing recommendations, Casino-Hotel Defendants and their co-conspirators abandoned this principle and took actions that would have been against their individual economic self-interests in the absence of coordination. One would have expected a sector that had experienced years of financial depression to strive to increase occupancy by competing on price to fill guestrooms. Not only would the competing casino-hotels have received more income from the rental of their rooms, but they also would have obtained a proportionately greater amount of revenue from their casinos due to the additional guests staying at their hotels.

147.    But the data clearly shows that this type of competition did not happen. Instead, room rates increased while occupancy rates either fell or remained stagnant. This type of behavior

is clearly against the independent interest of each Casino-Hotel Defendant. It makes no sense *unless they were engaged in a cartel to fix guestroom prices.*

148.     Additionally, there are no market factors, like rising costs or increased demand, that sufficiently can explain the kind of increase in room rates and corresponding revenue that Casino-Hotel Defendants each have obtained during the Class Period.

### iv.   Defendants' Scheme Does Not Benefit the Market.

149.     Defendants' anticompetitive actions have not benefitted competition or produced pro-competitive effects in the Atlantic City Casino-Hotel Market.

150.     Defendants' misconduct has benefitted Defendants by increasing their revenues and profits and caused consumers to pay artificially inflated prices.

151.     While Defendants' misconduct has increased Defendants' operational efficiencies by saving them time, labor costs, and other resources. It has also made it more difficult and time-consuming for consumers to identify and secure meaningfully cheaper rates for comparable rooms offered by their co-conspirators.

### v.   Traditional Conspiracy Evidence Is Also Present.

152.     There are several additional facts that tend to show collusion: (a) a radical change in business practices by the Casino-Hotel Defendants; (b) the conspirators' adoption of a common course of action; (c) opportunities for the conspirators to conspire; and (d) exchange of competitively sensitive information among Casino-Hotel Defendants.

153.     Casino-hotels traditionally have attracted customers by offering substantial savings on guestrooms. And until relatively recently, the Atlantic City Casino-Hotel Market was no exception. But as soon as they gained market power, Casino-Hotel Defendants abandoned decades of traditional *competitive* guestroom pricing practices and took up coordinated use of the

Rainmaker platform instead.

154.    This change in strategy came after years of financial struggle. By collectively using the Rainmaker platform to "optimize" each property's room rates and make "rate shopping" a futile endeavor, Casino-Hotel Defendants engaged in a successful anticompetitive cartel.

155.    They risked that any single Casino-Hotel Defendant would either continue to offer cheaper room rates or substantially cheat after joining the conspiracy by cutting rates to increase occupancy rates. Either outcome would render the conspiracy ineffective. The most reasonable explanation for this turn of events and resulting impact on the market is collusion.

156.    Casino-Hotel Defendants, with Rainmaker's and Cendyn's knowledge and full support, engaged in identical anticompetitive conduct; that is, they all the Rainmaker platform to set pricing for their guestrooms during the Class Period.

157.    And Rainmaker and Cendyn ensured that Casino-Hotel Defendants knew what their purported competitors were up to (not competing) by using marketing materials and industry publications read by Casino-Hotel Defendants and events widely attended by Casino-Hotel Defendant executives, Rainmaker and Cendyn. Certain Casino-Hotel Defendants also openly touted their use of the Rainmaker pricing algorithms through customer testimonials that Rainmaker and Cendyn would then use to market to other casino-hotels.

158.    And Casino-Hotel Defendants had multiple ways to ensure the effectiveness of their scheme. Each regularly filed financial reports throughout the calendar year with the NJDGE; and because these filings are public, each Casino-Hotel Defendant accessed, reviewed, and monitored each other's reports and data. Further, the NJCCC's annual industry reports also gave them valuable insights into the guestroom rates, occupancy levels, and revenues of their co-conspirators. It was easy for the Defendants to assemble a clear picture of their co-conspirators' room pricing and ensure

the success of the price-fixing conspiracy.

159.   There was no shortage of opportunities to conspire during the Class Period. Industry events, where the Rainmaker platform was often being discussed or presented, provided key Rainmaker, Cendyn, and Casino-Hotel Defendant employees the chance to conspire or discuss the scheme. Meetings of the city's casino trade association, The Casino Association of New Jersey ("CANJ"), provided a private setting for its members (which includes all the Casino-Hotel Defendants) to discuss pricing practices and revenue and profitability concerns and strategies.[60] Furthermore, Rainmaker and Cendyn regularly discussed pricing strategies with individual Casino-Hotel Defendants.

160.   The Rainmaker platform, pricing strategies, and revenue optimization were frequently discussed at industry conferences attended by Defendants.

161.   Rainmaker hosted annual user conferences and summits which allowed casino-hoteliers (including Casino-Hotel Defendants) to be "in the room with colleagues and like-minded individuals with varying degrees of revenue management experience and who have similar goals and challenges." According to Pavan Kapur, Caesars Entertainment's Senior VP of Commercial Operations (and formerly its VP of Revenue Management), a Rainmaker event "was a great experience."[61]

162.   Rainmaker's "OPTIMIZE2016" Summit "convened more than 300 people for three days of substantive sessions addressing the state of the industry and solutions that move beyond

---

[60] The Casino Association of New Jersey, https://casinosnj.org/.
[61] Press Release, Rainmaker, *GuestREV® Mobile, New GroupREV® Functionality, and Market/Business Intelligence 'Steal Show' at Rainmaker Client Summit* (Mar. 27, 2015), https://www.prweb.com/releases/2015/03/prweb12611855.htm.

revenue management to profit optimization."[62] According to an early March 2016 article, "OPTIMIZE2016 delivered a lively debate between Rainmaker co-founders Bruce Barfield and Tammy Farley on macroeconomic trends" and "town hall-style meetings that offered visitors a walk-through of Rainmaker products." "OPTIMIZE2016 was our most ambitious and well-attended conference yet," said Farley.[63]

163.    Attendees of Rainmaker's 2019 Summit praised GuestREV. According to one client, "15 month[s] after our implementation, we've seen revenue increases upwards of 6 percent," while another lauded "we were able to improve our rate and our profitability year over year."[64]

164.    G&L's Roundtable event, discussed above, "shapes the gaming and hospitality industry landscape each year by bringing together in one forum the very people who can foster change and innovation as comprised on the G&L Board and their invited Colleagues." This "open and enjoyable two-day forum" allows "industry thought leaders to collaborate, learn, and share best practices while meeting new peers and solidifying old friendships."[65]

165.    G&L also hosts golf outings, which are well-attended by Defendants' high-level employees. In fact, Rainmaker's Farley and Barfield served as "Partner Co-Hosts of the Roundtable" and ran the organization's golf invitational for "many years."[66]

---

[62] Press Release, Rainmaker, *Rainmaker's OPTIMIZE2016 User Conference Delivers Insight, Instruction and Impetus to 'Make Revenue Optimization Great Again'* (Mar. 2, 2016).
https://www.hotel-online.com/press_releases/release/rainmakers-optimize2016-user-conference-delivers-insight-instruction/.
[63]*Rainmaker's OPTIMIZE2016 User Conference Delivers Insight, Instruction and Impetus to 'Make Revenue Optimization Great Again'*, RESORT TRADES (Mar. 3, 2016),
https://web.archive.org/web/20160330015939/https://resorttrades.com/rainmakers-optimize2016-conference-make-revenue-optimization-great-again/.
[64] Cendyn, *Guestrev Success Stories* (2023), https://www.cendyn.com/customer-stories/?csp=guestrev.
[65] Gaming & Leisure, *2023 G&L Roundtable – October 8-9* (2023), https://mygamingandleisure.com/gl-roundtable.
[66] *The 2019 G&L Roundtable,* GAMING & LEISURE MAGAZINE (Winter 2019),
https://www.bluetoad.com/publication/?i=638719&article_id=3548450&view=articleBrowser.

166. After Cendyn acquired Rainmaker, its key personnel regularly attended G&L Roundtable events. For example, Senior VP for Commercial-Customer Relationship Management Robert Magliozzi and VP of Enterprise Sales for Gaming and Casinos Angie Dobney attended various G&L Roundtable-sponsored golf outings.

167. Attendees at the G&L Roundtable conference have included Casino-Hotel Defendant management personnel with responsibilities related to their companies' implementation and maintenance of the Rainmaker platform, including representatives from Caesars Entertainment, MGM Resorts, and Hard Rock Atlantic City.

168. And Caesars Entertainment's Senior VP of Information Technology Peter Broughton, MGM Resorts' VP of Operations Craig Jacobs and Corporate Information Technology Lead Product Manager Fran Moore, and Hard Rock Atlantic City's VP of Information Technology Don Kneisel all sit on G&L's Board.

169. G&L Board members also communicate privately during in-person gatherings including those noted above as well as through a "private group for G&L Board Members only" on LinkedIn. G&L CEO Jeannie Caruso "created this private, no cost, easy to navigate group for our Board so that you can communicate freely on questions, best practices, and strategy etc." This group, Caruso told board members, "is your private forum to work with peer G&L Board Members to garner insights and collaborate together."[67] Throughout the Class Period, G&L Board members have included executives from MGM Resorts, Seminal Hard Rock, Caesar's Entertainment, and Hard Rock Casino, Atlantic City.

170. The annual Hospitality Sales and Marketing Association International Revenue Optimization Conferences ("HSMAI ROC") offers Defendants another opportunity to conspire.

---

[67] https://www.linkedin.com/groups/12395008/

"HSMAI's ROC has delivered the most compelling and comprehensive event for the hotel revenue optimization discipline,"[68] one publication noted. "ROC convenes leaders of revenue optimization and pricing . . . who want to learn new ways of thinking about today's challenges, and gain insights into the short- and long-term trends that will impact hotel revenue optimization."[69]

171.    Rainmaker and Cendyn personnel certainly feel the same. Both have had prominent sponsorship roles at HSMAI events over the years. Both companies were Platinum Partners for the 2019 HSMAI ROC held June 18-19, 2019, in Minneapolis, Minnesota.[70]

172.    Following the 2019 acquisition of Rainmaker, Cendyn continued to have a formidable presence along with Casino-Hotel Defendants at the annual HSMAI ROC. Various management personnel from Cendyn, Hard Rock International, and MGM Resorts attended the 2022 conference.

173.    And Defendants don't just attend HSMAI conferences. In fact, while he was MGM Resorts' Executive Director of Revenue Optimization and Revenue Strategy (and importantly, during the Class Period), Michael Klein sat on HSMAI's Revenue Management Advisory Board. Currently, Caesar Entertainment's Senior VP of Commercial Operations Pavan Kapur and MGM Resorts' Chief Sales Officer and Senior VP Stephanie Glanzer serve as HSMAI Americas Board

---

[68] Events in America, *HSMAI - Hospitality Sales And Marketing Association International-ROC 2023 - Revenue Optimization Conference* (2023),
https://eventsinamerica.com/events/hsmai-hospitality-sales-and-marketing-association-international-roc-2023-revenue-optimization-conference/business/marketing-publishing#:~:text=HSMAI%E2%80%99s%20ROC%20has%20delivered%20the%20most%20compelling%20and%20comprehensive%20event%20for%20the%20hotel%20revenue%20optimization%20discipline.
[69] HSMAI, *HSMAI ROC* (2019),
https://commercial.hsmai.org/schedules/roc/#:~:text=ROC%C2%A0convenes%20leaders,hotel%20revenue%20optimization.
[70] *Hotel Revenue Leaders to Convene at HSMAI's ROC Americas in Minneapolis*, GLOBAL TRAVEL MEDIA (Apr. 30, 2019),   https://eglobaltravelmedia.com.au/2019/04/30/hotel-revenue-leaders-to-convene-at-hsmais-roc-americas-in-minneapolis.

members alongside Michael Klein.

174.    Atlantic City-based Casino-Hotel Defendants belong to and fund the city's casino-hotel trade association, CANJ. CANJ "is a trade organization that provides a collective voice for the Atlantic City casino industry by facilitating the exchange of information and ideas between our industry, small businesses, Atlantic City stakeholders and the general public."[71]

175.    CANJ's membership consists of the city's nine casino-hotels, including each Atlantic-City-based Casino-Hotel Defendant and is funded by undisclosed membership fees.

176.    CANJ is housed at one of its Casino-Hotel Defendant member's properties. According to the Chamber of Commerce of Southern New Jersey, the organization's address is "c/o Caesars Atlantic City, 2100 Pacific Avenue, Atlantic City, NJ 08401."[72]

177.    CANJ's membership elects its President from the pool of leaders representing its member casino-hotels. Past Presidents of the group include senior executives from Hard Rock Atlantic City, Caesars Entertainment, and Borgata.

178.    CANJ's "Media Releases" demonstrate that members regularly discuss issues like revenue trends. CANJ's January 17, 2023 Media Release "reacted to the December 2022 Division of Gaming Enforcement (DGE) gaming revenue results report, which showed that 2022 was a year of rebuilding and recovery for the Atlantic City casino industry."[73] In its December 17, 2021 Media

---

[71] The Casino Association of New Jersey, https://casinosnj.org/page/2/about-canj#:~:text=is%20a%20trade%20organization%20that%20provides%20a%20collective%20voice%20for%20the%20Atlantic%20City%20casino%20industry%20by%20facilitating%20the%20exchange%20of%20information%20and%20ideas%20between%20our%20industry%2C%20small%20businesses%2C%20Atlantic%20City%20stakeholders%20and%20the%20general%20public (last visited July 20, 2023).

[72] Chamber of Commerce Southern New Jersey, https://business.chambersnj.com/directory/Details/casino-association-of-new-jersey-891105#:~:text=c/o%20Caesars,08401 (last visited July 20, 2023).

[73] Press Release, The Casino Ass'n of NJ, *As 2022 Marks a Year of Rebuilding for Atlantic City, Casinos are Making Significant Investments in Resort City in Year Ahead* (Jan. 17, 2023), https://casinosnj.org/news.show&nid=597#:~:text=reacted%20to%20the%20December%202022%20Division%20of%20Gaming%20Enforcement%20(DGE)%20gaming%20revenue%20results%20report%2C%20which%20showed%20that%202022%20was%20a%20year%20of%20rebuilding%20and%20recovery%20for%20the%20Atlantic%20City%20casino%20industry.

Release, CANJ provided a "statement regarding the November 2021 Gaming Results"[74] that discussed total casino-hotel revenue for that month and compared to the same month from an earlier year.

179.    Casino-Hotel Defendants' membership and control over this organization provides them with additional opportunities to exchange competitively sensitive information and strategies and agree on common courses of anticompetitive conduct behind closed doors.

180.    Cendyn facilitated this anticompetitive scheme by encouraging Casino-Hotel Defendants to feed the Rainmaker platform non-public and sensitive pricing data; sharing this pricing data as well as strategies with should-be competing Casino-Hotel Defendants; and encouraging Casino-Hotel Defendants to pursue coordinated pricing strategies through their use of the Rainmaker platform.

181.    Casino-Hotel Defendants feed their current non-public pricing and occupancy data to the Rainmaker platform, it uses this data and additional information to recommend "optimal" guestroom pricing to each Casino-Hotel Defendant. This improper information sharing disadvantages both members of the Class (defined *infra* in ¶ 196) and competition in the entire Atlantic City Casino-Hotel Market.

182.    As discussed above, Cendyn also led discussions at industry events attended by personnel from Casino-Hotel Defendants on the most effective ways to maximize room revenue and avoid price wars. Of course, central to theses discussion was encouraging use of the Rainmaker platform.

---

[74] Press Release, The Casino Ass'n of NJ, *Casino Association of New Jersey Statement on November 2021 Gaming Results* (Dec. 17, 2021), https://casinosnj.org/news.show&nid=552#:~:text=statement%20regarding%20the%20November%202021%20Gaming%20Results.

183.     Cendyn met with Casino-Hotel Defendants individually as part of pitching the Rainmaker platform and the initial set-up and implementation. Cendyn touted "best practices" and pricing strategies during these one-on-one periodic meetings.

184.     Undoubtedly, Cendyn used non-public information gleaned from communications with one casino-hotelier in conversations with another. This type information exchange is anticompetitive and has directly resulted in artificially inflated guestroom rates at Casino-Hotel Defendant properties during the Class Period.

185.     Experts in the antitrust field agree that when competitors use a shared pricing algorithm to set prices, anticompetitive effects of the same type observed in the Atlantic City Casino-Hotel Market will occur.

186.     In their May 2017 paper titled *Algorithmic Collusion: Problems and Counter-Measures*, Competition law professors Ariel Ezrachi and Maurice Stucke wrote: "An industry-wide use of a single algorithm, which competitors use to determine the market price or react to market changes, would result in de-facto hub-and-spoke structure, as the market behavior of the competitors aligns due to the use of a similar 'brain' to determine their price strategy. These effects intensify when sellers use the same data pool and are privy to vast volumes of data."[75]

187.     And in 2017, Maureen Ohlhausen, the then-acting Chair of the Federal Trade Commission explained: "Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates its pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy

---

[75] Ariel Ezrachi & Maurice Stucke, *Algorithmic Collusion: Problems and Counter-Measures*, ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT (May 31, 2017), https://one.oecd.org/document/DAF/COMP/WD%282017%2925/En/pdf.

information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices. Again, this is fairly familiar territory for antitrust lawyers, and we even have an old-fashioned term for it, the hub-and-spoke conspiracy."[76]

188.    In a March 2021 paper titled *Autonomous Algorithmic Collusion: Economic Research and Policy Implications*, a team of economists discussed the anticompetitive consequences of competitors using the same third-party algorithm to set prices: "Algorithmic pricing can also affect competition if a single intermediary software provider sells their product to multiple competitors. Such adoption could lead to hub-and-spoke (where the provider acts as the hub of the sellers, Ezrachi and Stucke 2015) or parallel-use scenarios, with competitors coordinating to higher prices by delegating choices or relaying information to the same third party."[77]

## V.    FRAUDULENT CONCEALMENT

189.    Defendants engaged in an illegal scheme to fix prices in violation of the federal antitrust laws. Criminal and civil penalties for engaging in such conduct are severe. Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

190.    Defendants actively and purposely concealed their anticompetitive scheme by covertly submitting guestroom pricing and occupancy data to the Rainmaker platform; discussing pricing strategies, the Rainmaker platform, and optimizing guestroom revenues at private industry

---

[76] Maureen K. Ohlhausen, Chairman, U.S. Federal Trade Commission, *Should We Fear The Things That Go Beep In the Night? Some Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing* (May 23, 2017).
[77] Stephanie Assad et al, *Autonomous algorithmic collusion: economic research and policy implications*, 37 OXFORD REVIEW OF ECONOMIC POLICY, 459-478 (2021).

conferences, including those run by Cendyn; and discussing pricing strategies, the Rainmaker platform, and optimizing guestroom revenues during one-on-one meetings between Casino-Hotel Defendants personnel and Cendyn employees.

191.    Casino-Hotel Defendants intentionally concealed their use of a shared third-party pricing algorithm that utilized their own current pricing and supply data and solved the "problem" of guest price-shopping to set guestroom rates from Plaintiff and the other Class members.

192.    Casino-hotel Defendants have made intentionally misleading statements about offering competitive room rates in their marketing materials and on their booking websites. They have also omitted their coordinated use of the Rainmaker platform to set guestroom rates. This allowed Casino-Hotel Defendants to be able to conceal their anticompetitive scheme from customers.

193.    In fact, Borgata personnel admitted that "guests who use the hotel's website to book a stay see only the optimized recommended rate" while "[t]he mathematics behind the rate is imperceptible."[78]

194.    Defendants' misrepresentations regarding their pricing methods and public statements about the competitiveness of their guestroom rates were intended to, and did, lull Plaintiff and the Class into thinking the prices on casino-hotel rooms in Atlantic City were the result of genuine competitive rate-setting. Thus, Plaintiff and the other Class members were at an information disadvantage and had no reason to investigate guestroom pricing among Casino-Hotel Defendants.

195.    Although Plaintiff exercised reasonable diligence, such diligence would not have,

---

[78] Customer Story, *Borgata Hotel Casino & Spa's success with Guestrev*, https://www.cendyn.com/customer-stories/borgata-hotel-success-rainmaker-guestrev/.

and indeed did not, reveal Defendants' scheme. This is because the Defendants, through their misleading, deceptive, false and fraudulent statements and material omissions, sought to conceal their conspiracy from Plaintiff and the Class.

196.    Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiff and the Class as a result of Defendants' anticompetitive and unlawful conduct. Plaintiff and the other members of the Class were unaware of Defendants' unlawful conduct and did not know they were paying supra-competitive prices for guestrooms at Casino-Hotel properties during the Class Period. For these reasons, Plaintiffs claims are timely under the federal laws identified herein.

## VI.    CLASS ALLEGATIONS

197.    Plaintiff brings this action on behalf of herself, as representative of the class defined below, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3):

> All persons who have directly purchased a guestroom for rent in Atlantic City, New Jersey, from one or more Casino-Hotel Defendants or co-conspirator casino-hotels, or from a division, subsidiary, predecessor, agent, or affiliate of such entity, from no later than June 27, 2018, until Defendants' unlawful conduct and its anticompetitive effects stop. Excluded from the class are federal and state governmental entities and judicial officers presiding over this case.

198.    The Class is so numerous that joinder of all members in this action is impracticable. There are tens if not hundreds of thousands of geographically dispersed Class members.

199.    The Class members, moreover, can be readily identified and notified in an administratively feasible manner using, among other information, the electronic transactional records of Casino-Hotel Defendants.

200.    Plaintiff's claims are typical of those of the Class. Plaintiff and all members of the

Class allege that Defendants' alleged misconduct violates Section 1 of the Sherman Act. Plaintiff and all Class members also allege and will show that they were injured by the same anticompetitive and unlawful conduct that resulted in them paying more for hotel rooms in the Atlantic City Casino-Hotel market than they otherwise would have paid in the absence of their collusive conduct.

201.   Plaintiff fairly and adequately will protect and represent the interests of Class members. The interests of Plaintiff and Plaintiff's counsel are fully aligned with, and not antagonistic to, the interests of the Class members. Plaintiff is willing and able to dispatch the duties incumbent upon a class representative to protect the interests of all Class members. In addition, Plaintiff's counsel have significant experience successfully prosecuting complex antitrust class actions and possesses the necessary resources to vigorously litigate the case on behalf of the Class.

202.   There are multiple questions of law and fact that are common to the Class, including:

    a.   Whether Defendants entered into a formal or informal agreement, combination, conspiracy, or common understanding in which Casino-Hotel Defendants artificially raised prices for or artificially suppressed the supply of hotel rooms in the Atlantic City Casino-Hotel Market;

    b.   Whether Defendants' alleged misconduct constitutes a *per se* violation of Section 1 of the Sherman Act;

    c.   Whether Defendants' alleged misconduct, in the alternative, constitutes a violation of Section 1 of the Sherman Act pursuant to a quick look analysis or a rule of reason analysis;

    d.   Whether Defendants' alleged misconduct in fact caused Class members to

pay artificially high hotel room prices to Casino-Hotel Defendants in the Atlantic City Casino-Hotel Market;

e.     The proper measure of Class-wide damages;

f.     The scope and extent of injunctive relief needed to remedy the anticompetitive effects of Defendants' alleged conduct going forward; and

g.     Whether Defendants fraudulently concealed the existence of the alleged conspiracy such that the statute of limitations is tolled.

203.    Questions of law and fact common to the members of the Class will predominate over any individualized questions of law or fact. Defendants have acted and refused to act on grounds generally applicable to the Class.

204.    In cases like this one that allege price-fixing among competitors, including those with a hub-and-spoke component, the common question of law and fact regarding the existence of the alleged conspiracy by itself has been held to predominate over any possible individualized issues, thus warranting certification. The same holds true here.

205.    Class treatment is the superior method for the fair and efficient adjudication of this controversy. It will allow the scores of Class members to prosecute their common claims, and for Defendants to defend themselves against these claims, in front of a single court simultaneously and efficiently before ultimately reaching resolution without unnecessary duplication of effort and expense that separate actions would present. The benefits of proceeding with this procedural mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this case as a class action.

## VII.    CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### FOR AGREEMENT IN RESTRAINT OF TRADE 15 U.S.C. § 1

206.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

207.    Beginning at least as early as June 27, 2018, Defendants formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

208.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants for Casino-Hotel Defendants to knowingly and collectively use the Rainmaker platform and engage in other related types of reinforcing conduct to fix, stabilize, and artificially increase the price of rooms rented directly to guests.

209.    This conspiracy caused Plaintiff and the other Class members to pay artificially inflated prices directly to Casino-Hotel Defendants and their co-conspirators for room rentals in the Atlantic City Casino-Hotel Market during the Class Period.

210.    As detailed above, the contract, combination, or conspiracy alleged herein has taken the form of a hub-and-spoke conspiracy in which Rainmaker, and later Cendyn, served as the hub and the individual Casino-Hotel Defendants served as spokes.

211.    In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including the acts discussed above and those that follow:

> h.    Casino-Hotel Defendants provided current internal pricing and supply data to a single third-party (first Rainmaker and then Cendyn) for use in the Rainmaker platform;

48

      i.     Rainmaker, and later Cendyn, sold and operated the Rainmaker platform that provided room pricing recommendations to Casino-Hotel Defendants;

      j.     Casino-Hotel Defendants knowingly used the same pricing algorithm platform that incorporated pricing and supply data from other Casino-Hotel Defendants in recommending optimal room rates for each Casino-Hotel Defendant to charge guests;

      k.     Casino-Hotel Defendants priced their rooms pursuant to the optimal rates the Rainmaker platform recommended;

      l.     Defendants exchanged competitively sensitive pricing and supply information with each other, including through use of the Rainmaker platform; and

      m.     Defendants engaged in various forms and methods of bilateral and multilateral communication across various settings and venues concerning room pricing, supply and revenue, including their use of the Rainmaker platform to set and monitor room rates, that had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

212.    Casino-Hotel Defendants possess market power in the relevant antitrust market: the Atlantic City Casino-Hotel Market. The relevant product market is the market for the rental of guest rooms in casino-hotels, and the relevant geographic market is Atlantic City, New Jersey.

213.    Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of supra-competitive prices Plaintiff and the other Class members have paid directly to Casino-Hotel Defendants for room rentals in the Atlantic City Casino-Hotel Market.

214.    As a direct and proximate result of Defendants' past and continuing violation of

Section 1 of the Sherman Act, Plaintiff and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for hotel rooms than they would have paid in the absence of the conspiracy.

215.     Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act. In the alternative, Defendants' conspiracy violates Section 1 of the Sherman Act under either a quick look or rule of reason analysis.

216.     There are no procompetitive justifications for Defendants' conspiracy, and any proffered procompetitive justifications could have been achieved through less restrictive means.

217.     Plaintiff seeks monetary and injunctive relief on behalf of herself and all other members of the Class under Section 4 of the Clayton Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and a Class of all others similarly situated, respectfully requests judgment against Defendants as follows:

A. The Court determine that this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and Plaintiff's counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

B. The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed to violate of Section 1 of the Sherman Act;

C. Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable laws, and that a joint and several judgment in favor of Plaintiff and the

members of the Class be entered against Defendants in an amount to be trebled under applicable law;

D.   Defendants, their affiliates, successors, transferees, assignees, officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

E.   Plaintiff and the members of the Class be awarded pre- and post-judgment interest in the maximum amount and to the maximum extent permitted by law;

F.   Plaintiff and the members of the Class recover their costs of suit and reasonable attorneys' fees to the maximum extent allowed by law; and Plaintiff and the members of the Class be awarded any other relief as the case may require and the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial under Federal Rule of Civil Procedure 38(b) on all triable issues.

**DATED:** August 21, 2023                    /s/ *Stanley O. King*

Stanley O. King (SBN #03413-1996)
Eric G. Kahn (SBN #02103-1993)
**JAVERBAUM WURGAFT HICKS KAHN WIKSTROM & SININS, P.C.**
231 South Broad Street
Woodbury, NJ 08096
Tel:  (856) 845-3001
stan@kingslaw.com
EKahn@JaverbaumWurgaft.com

51

**SPECTOR ROSEMAN & KODROFF, P.C.**
William G. Caldes (SBN #00062-1995)
Jeffrey L. Spector (SBN #03375-2007)
Icee N. Etheridge (SBN #20256-2016)
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
bcaldes@srkattorneys.com
jspector@srkattorneys.com
ietheridge@srkattorneys.com

**FREED KANNER LONDON AND MILLEN, LLC**
Jonathan M. Jagher*
*Pro Hac Vice Forthcoming*
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6486
jjagher@fklmlaw.com

**FREED KANNER LONDON AND MILLEN, LLC**
Michael E. Moskovitz*
*Pro Hac Vice Forthcoming*
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
mmoskovitz@fklmlaw.com

**MCLAFFERTY LAW FIRM, P.C.**
David P. McLafferty*
*Pro Hac Vice Forthcoming*
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 940-4000
dmclafferty@mclaffertylaw.com

*Attorneys for Plaintiff*